(No. 20864.—)

THE PEOPLE *ex rel.* Hazen S. Capron, Petitioner, *vs.* OSCAR NELSON, Auditor of Public Accounts, Respondent.

*Opinion filed April 30, 1931.*

SVEINBJORN JOHNSON, (DRYER & BROWN, of counsel,) for petitioner.

OSCAR E. CARLSTROM, Attorney General, (B. L. CATRON, of counsel,) for respondent.

Mr. JUSTICE STONE delivered the opinion of the court:

This is an original petition for *mandamus* filed by leave of court on behalf of the petitioner, Hazen S. Capron, as a citizen and tax-payer and as treasurer of the board of trustees of the University of Illinois, by which a writ is sought directing defendant, as Auditor of Public Accounts, to register certain tax anticipation notes issued under authority of an act entitled "An act in relation to the anticipation of taxes levied by the State of Illinois," approved and in force April 13, 1931. The Auditor of Public Accounts has demurred to the petition, and the facts alleged in said petition are to be taken as true. They are as follows:

A large portion of the taxes levied and extended for State purposes for the year 1929 are, by reason of delay in

collection, still uncollected and have not been paid into the State treasury. These uncollected taxes amount to several million dollars. The relator, as treasurer of the board of trustees of the University of Illinois, states in his petition that by reason of the delay in collection of State revenues there will exist in the University of Illinois fund on July 1 a deficit of approximately $1,100,000; that said fund is now depleted and has been since the first of April, 1931, and contains no money with which to meet the ordinary expenses of the university, and that by May 1 there will be a deficit in that fund of $440,000. To meet this situation, and a similar situation in other expense funds of the State, the General Assembly enacted the following act, which by reason of an emergency clause contained therein became on its passage and approval, and now is, if valid, in full force and effect. This act is as follows:

"Sec. 1. If at any time prior to July 1, 1933, the moneys in any fund in the State treasury defined by law become or are about to become insufficient to meet expenses of the State payable from such fund, and taxes have theretofore been levied by the General Assembly payable into such fund in the State treasury, and the Governor, the Treasurer and the Auditor of Public Accounts have computed the rate per cent required for such levy, and such rate has been certified to the several county clerks, the Governor, the Treasurer and the Auditor of Public Accounts are authorized to provide moneys in such fund by the issuance and sale from time to time of notes drawn against and in anticipation of such taxes.

"Sec. 2. Notes so issued shall be sold to the highest responsible bidder after such advertisement as shall be directed by the Governor, the Treasurer and the Auditor of Public Accounts. The proceeds of such sale shall, in each case, be paid into the particular fund in the State treasury into which the taxes against and in anticipation of which such notes are issued, are required by law to be paid.

"Sec. 3. Notes so issued in anticipation of taxes levied shall not be in excess of seventy-five per cent of the taxes so levied and not received into the State treasury. They shall bear interest at a rate to be fixed by the Governor, the Treasurer and the Auditor of Public Accounts but not to exceed six per cent. The denomination and form of these notes shall be fixed by the officers named. They shall be numbered and each shall bear the signatures of these officers, and shall be registered by the Auditor of Public Accounts in a book kept for that purpose. The notes shall state the particular State tax against and in anticipation of which they are issued and that the notes are payable, both principal and interest, solely from said tax when collected and ·not otherwise.

"Sec. 4. Notes issued under this act shall be a pledge of so much of the taxes against which they were issued and shall be payable only out of and from the proceeds of such taxes and such taxes when received shall first be used for payment of the notes and interest thereon.

"Sec. 5. The following named sums, or so much thereof as may be necessary, are appropriated to the Treasurer from the several funds stated but only from moneys received and held in such funds from taxes against and in anticipation of which notes have been issued in accordance with this act, for the purpose of paying the principal and interest of such notes:

From the general revenue fund................$15,500,000
From the University of Illinois fund..........  3,500,000
From the common school fund...............  13,000,000
From the waterway bond fund..............   1,700,000
From the soldiers' compensation bond interest
    and retirement fund...................   5,500,000

"Sec. 6. These appropriations herein made are subject to the provisions of 'An act in relation to State finance,' approved June 10, 1919, as amended.

"Sec. 7. Because some of the funds in the State treasury will be depleted before July 1, 1931, and it is necessary that moneys be made available for expenditures payable from these funds, therefore an emergency exists and this act shall take effect upon its passage."

Pursuant to the provisions of the act, the Governor, the Auditor of Public Accounts and the State Treasurer, on the 14th day of April, 1931, convened, as required by the act, and found that the University of Illinois fund in the State treasury is insufficient to meet ordinary and contingent expenses of the university, and further found that the State taxes for the year 1929 had theretofore been levied by the General Assembly; that the Governor, the State Treasurer and the Auditor of Public Accounts had duly computed the rate required for the levy of such tax, which rate had been certified to the several county clerks and by them extended against the taxable property, and that the sum of $1,535,540 of such fund so levied and extended had not been paid into the State treasury. The Governor, the Auditor of Public Accounts and the State Treasurer, to provide funds to meet the deficiency in the University of Illinois fund, as required by this act, issued a certificate authorizing the issuance and sale of notes against and in anticipation of such taxes. Section 1 of this certificate and authorization is as follows:

"Sec. 1. That for the purpose of procuring money to pay expenses of the State of Illinois in connection with the use and maintenance of the University of Illinois, there be issued notes drawn against and in anticipation of taxes so levied for the year 1929 for the use and maintenance of the University of Illinois in the amount of $440,000, which amount is not in excess of seventy-five per cent of taxes so levied for the year 1929, and not received into the State treasury. That said notes bear interest from date thereof until paid at the rate of not to exceed six per cent per annum, except when lawfully purchased with moneys belonging to the State of Illinois in which case two per cent in-

terest shall be paid, payable when principal of said notes is paid and that both principal and interest of said notes be payable at the office of the State Treasurer, Springfield, Illinois. That said notes be signed by the Governor, the Treasurer and the Auditor of Public Accounts of the State of Illinois, and registered by the Auditor of Public Accounts in a book kept for that purpose. That said notes be dated, numbered and of the denomination as may hereafter be agreed upon with the purchaser of said notes. That said notes, both principal and interest, be payable solely from said tax so levied for the year 1929 for the use and maintenance of the University of Illinois when collected and not otherwise."

The certificate of the Governor, Auditor of Public Accounts and State Treasurer also prescribed the form of tax anticipation note to be used, which form is in compliance with said act. It also directs that the taxes to be paid into the University of Illinois fund shall be pledged for the payment of the tax anticipation notes, and that such taxes, when paid in, shall first be used for the payment of those notes. This certificate also provided for the sale of the notes to the highest responsible bidders, as required by the act.

Pursuant to the finding of the certificate the Governor, Treasurer and Auditor issued one of the tax anticipation notes as a part of the total issue of $440,000 against the taxes to be paid into the University of Illinois fund, which note is in the sum of $25,000 and is in form and substance as required by the act and as provided in said certificate. These officials signed this note on April 14, 1931. The relator avers that the defendant, as Auditor of Public Accounts, has refused to register such note or any tax anticipation note which might be issued under authority of said act and certificate. These notes so prepared and issued by the said officials are in anticipation of the taxes for the year 1929 already levied and extended and to be paid into the University of Illinois fund but not as yet received into the State treasury.

The petition alleges that an emergency exists, in that the moneys in the University of Illinois fund have become insufficient to meet the expenses of the university payable from such fund and that such emergency is within the meaning and purpose of the said act. The defendant has demurred to the petition and raises the question of the validity of the act.

It is argued by the Attorney General that this act provides for the creation of a debt, against the prohibition of section 18 of article 4 of the constitution. That section, so far as applicable here, is as follows: "Each General Assembly shall provide for all the appropriations necessary for the ordinary and contingent expenses of the government until the expiration of the first fiscal quarter after the adjournment of the next regular session, the aggregate amount of which shall not be increased without a vote of two-thirds of the members elected to each house, nor exceed the amount of revenue authorized by law to be raised in such time; and all appropriations, general or special, requiring money to be paid out of the State treasury, from funds belonging to the State, shall end with such fiscal quarter: *Provided,* the State may, to meet casual deficits or failures in revenues, contract debts, never to exceed in the aggregate $250,000; and moneys thus borrowed shall be applied to the purpose for which they were obtained, or to pay the debt thus created, and to no other purpose, and no other debt, except for the purpose of repelling invasion, suppressing insurrection, or defending the State in war, (for payment of which the faith of the State shall be pledged,) shall be contracted, unless the law authorizing the same shall, at a general election, have been submitted to the people, and have received a majority of the votes cast for members of the General Assembly at such election."

This question has not heretofore been presented to this court. It is conceded, as indeed it must be, that if this act provides for the creation of a debt against the State it is

invalid, since it authorizes the issuance of tax anticipation notes in excess of $250,000. In one sense each General Assembly in authorizing expenditures of the State government and in making appropriation of the amounts necessary to meet such expenditures might be said to be providing for the creation of a debt above the amount permitted by the constitution. As is well known, the aggregate appropriations of each General Assembly greatly exceed the amount of moneys actually in the State treasury when such appropriations are made. Such is not, however, a debt in the sense contemplated by the framers of the constitution, as is evidenced by the language of this same section, which lays upon the legislature the mandate that each General Assembly "shall provide for all the appropriations necessary for the ordinary and contingent expenses of the government until the expiration of the first fiscal quarter after the adjournment of the next regular session." By constitutional mandate the General Assembly is required to provide such revenue as may be needful by levying a tax, by valuation, on the property of the State, as by the constitution directed. (Art. 9, sec. 1.) When levied the tax becomes an asset of the State. It is a thing which the State has for the purpose of meeting the expenses of government and in legal contemplation is constructively in the treasury. It is conceded that the taxes of 1929 so levied and in the process of collection, but not yet received, greatly exceed in amount the sum total of the notes authorized by this act. If the word "debt," as used in the constitutional provision, be considered in the sense mentioned, then the drawing of a warrant on the treasury, even with money in the treasury to pay it, would create a debt which might well exceed the limit of indebtedness fixed by the constitution, for it must always be that some time will elapse between the issuance of the warrant and its payment, during which time the indebtedness of the State may, under such definition and use of the word, exceed the constitutional limit. Such a con-

struction of the constitution, however, would prevent the operation of State government by rendering impossible the compliance with other constitutional mandates regarding necessary expenditures. The word "debt," as there used, is not to receive such a hypercritical construction. The debt prohibited by that section is an obligation or liability, whether actual or contingent, which, singly or in the aggregate with other liabilities, will obligate the State to pay an amount in excess of $250,000. It cannot be said that a note or warrant issued in anticipation of a tax, already an asset of the State, creates a liability or indebtedness. The purpose of this constitutional provision is to keep the State from running into debt by keeping its expenditures within its revenues, except in certain cases therein specified. Though the construction of this section has not heretofore been presented to this court, section 12 of article 9 of the constitution, limiting the power of municipal corporations to contract indebtedness, has been construed by this court. Its provisions, in so far as of interest here, are as follows: "No county, city, township, school district, or other municipal corporation, shall be allowed to become indebted in any manner or for any purpose, to an amount, including existing indebtedness, in the aggregate exceeding five percentum on the value of the taxable property therein, to be ascertained by the last assessment for State and county taxes, previous to the incurring of such indebtedness."

In *City of Springfield* v. *Edwards,* 84 Ill. 626, that section was under consideration. It was charged that the city of Springfield had incurred indebtedness above its constitutional limitation. It was there held that where the tax appropriated has been actually levied, and the contract between the corporation and the holder of a tax anticipation warrant operates to prevent any liability accruing against the corporation, then in such case there is no debt, "because one thing is simply given and accepted in exchange for another." It was also held that under such circumstances "the

transaction is closed on the part of the corporation, leaving no future obligation, either absolute or contingent, upon it whereby its debt may be increased." It was there also pointed out that until a tax is levied there is nothing in existence which can be exchanged, and that if the making of the appropriation and issuing and accepting the warrant for its payment do not have the effect of relieving the corporation of all liability, or if it incurs any liability thereby, a debt is created.

In *Law* v. *People*, 87 Ill. 385, the case of *City of Springfield* v. *Edwards, supra,* was approved, and it was there held that a municipal corporation which has reached its constitutional limit of indebtedness may, when a tax is levied but not collected, draw against the fund thus levied and provided although not in the treasury; that such transaction is virtually an appropriation and assignment of the amount specified in the warrant to the person to whom it is issued and delivered; that the amount so assigned such holder has a right to receive, and it becomes the duty of the officers to collect and pay it to him. It was also held that the legal effect of such transaction is, that the person receiving such warrant discharges the corporation from all liability on account of the services or obligation for which it is drawn. The transaction is, in effect, a cash transaction. To the same effect are *Fuller* v. *Heath,* 89 Ill. 296, and *Hodges* v. *Crowley,* 186 id. 305.

It is argued by the Attorney General, however, that these anticipation notes cannot be considered as, in effect, the same as warrants of a municipality, for the reason that under the general Warrant act of 1913, authorizing municipalities to issue tax anticipation warrants, the taxes against which such warrants are issued are set apart and held for the payment of those warrants without further appropriation made at the time of their issuance or any other action by the municipality, while as to State revenues the legislature has, under the constitution, no power to authorize the

payment of notes of the character here involved without an appropriation for their payment. The constitutional restrictions applying to municipalities and those applying to the State are not, in substance or on principle, distinguishable. Section 12 of article 9 prohibits a municipality becoming indebted in any manner or for any purpose to an amount, including existing indebtedness, in the aggregate exceeding five percentum of the value of the taxable property therein, and by section 18 of article 4 the power of the legislature to contract debts is limited to the sum of $250,000, except as in the instances therein prescribed. The purpose of these two constitutional provisions is single, and is to prevent the creation of debts on the part of municipalities on the one hand and on the part of the State on the other. Whether called notes or warrants, the instruments authorized to be issued by municipalities or by the State are, in effect, the same. Each is an evidence of a transaction in which one thing is exchanged for another. Such is not the creation of a debt but is in the nature of a cash transaction. The note in one case, and in the other the warrant, is exchanged for the there specified portion of a fund lawfully created for the purpose for which the warrant or note is issued, which fund, the tax therefor having been levied, is in contemplation of law an asset of the State or municipality and constructively in the public treasury, lawfully applicable to the payment of such note or warrant. The fact that the Warrant act does not require further appropriation by the municipality while an appropriation is made by the act here considered in no way distinguishes the two transactions in their essential characteristics. In either case, when the note or warrant is issued and accepted the transaction is closed on the part of the State or municipality, leaving no future obligation, either absolute or contingent, upon it whereby its debt may be increased. The obligation thereafter is one resting on the officers to honor the notes or warrants when the fund is paid into the treasury as a first disbursement

of that fund. Such fund is not available for any other purpose until the notes or warrants against it are met. Such notes or warrants are payable only out of such fund when collected and from no other source. The transaction amounts, in either case, to an assignment of a specified portion of the fund. Such transactions are on principle the same, and no reason appears why the rule laid down in *City of Springfield* v. *Edwards, supra,* should not be applied to those of the character here involved. Any ·difference in handling these instruments is but one in method. On principle they are not distinguishable.

This question has received consideration by courts of States having constitutional limitations similar to ours. The cases there considered involved the issuance of tax anticipation warrants or notes against State revenues. Of such are *State* v. *Board of Examiners,* 197 Pac. (Mont.) 988; *State* v. *McCauley,* 15 Cal. 429; *In re Incurring of State Debts,* 19 R. I. 610, 37 Atl. 14; *Rowley* v. *Clarke,* 162 Iowa, 732, 144 N. W. 908; *State* v. *Medberry,* 7 Ohio St. 522; *Ash* v. *Parkinson,* 5 Nev. 154; *In re State Warrants,* 6 S. D. 518, 62 N. W. 101; *Bryan* v. *Menefee,* 21 Okla. 1, 95 Pac. 471. While in some of these States greater latitude has been allowed in the issuance of State warrants or notes in anticipation of taxes than is accorded by the rule announced by this court in *City of Springfield* v. *Edwards, supra,* yet all agree in the conclusion that such warrants or notes do not create a debt against the State, and it is evident from a reading of the opinions rendered that the same principle is found to be applicable to State warrants and notes as that held by this court to be applicable to tax anticipation warrants issued by municipalities. We are of the opinion that the rule announced in *City of Springfield* v. *Edwards, supra,* is applicable here.

It is also argued by the Attorney General that use of the words "note" and "pledge" indicates an obligation on the part of the State and therefore the creation of a debt;

that the word "note" has a well defined meaning in commercial law and is a kind of obligation; that the use of the word "pledge" makes the notes a lien upon the taxes and requires that they be held as security for the payment of such notes, and that the issuance of notes which constitute a pledge implies the creation of an obligation. These notes, so-called, provide "that the Treasurer of the State of Illinois, when received, will pay to the bearer at the office of the State Treasurer, Springfield, Illinois, the sum of ......dollars with interest thereon at the rate of ...... per cent per annum from the date hereof until paid or until notice shall be given by publication in a newspaper or otherwise that the money, for its payment, is available and that it will be paid on presentation. Principal hereof and interest hereon will be paid in lawful money of the United States of America from the proceeds of taxes when received, heretofore levied upon all the taxable property in the State of Illinois for the year 1929 for the use and maintenance of the University of Illinois. This note is issued against and in anticipation of said taxes so levied for the year 1929 to provide a fund to meet expenses of the State of Illinois in connection with the use and maintenance of the University of Illinois, and is payable, both principal and interest, solely from said taxes when collected, and not otherwise, which taxes are hereby assigned and pledged to the payment of this note and of all notes issued against and in anticipation of such taxes, the total of which notes so levied does not exceed seventy-five per cent of said taxes so levied and not received into the State treasury."

Regardless of the use of the words "note" and "pledge" this instrument is an assignment of taxes levied, and which are, in legal contemplation, assets of the State. By its terms it creates no other liability and makes no other pledge. It is more than a pledge—it is an assignment of the fund. The portion of the fund so assigned cannot be used for anything else and must be so used immediately upon the

payment of such fund into the State treasury. A pledge presupposes a right to the return of the thing pledged when the obligation for the security of which it is given has been met. Here the State has nothing further to do with the transaction, but its officers are required to turn over this fund, if and when collected, to the noteholders in the amounts called for by the notes, on presentation of such notes. Such a transaction cannot have the effect of creating a debt against the State.

Nor may it be said, as supposed, that the State is limited by the proviso contained in section 18 of article 4 of the constitution to the method there provided for meeting emergencies arising from failing revenues, which method is the creation of a debt not to exceed $250,000. This proviso is, in fact, an independent provision of that section. Its primary purpose is not to provide means of creating a debt but to prevent an increase in the indebtedness of the State beyond the amount of $250,000 to meet an emergency except as therein specified. It is not to be limited by the canon of construction generally applied to provisos, which excludes all other methods than the one therein prescribed, and it therefore constitutes no limitation upon the power of the legislature, in whom all legislative power not limited by the constitution rests, to meet an emergency of the character here involved in any method which does not create a debt against the State or contravene other provisions of the constitution.

It is pointed out that this act makes an appropriation of funds, and it is argued that as section 7 of article 9 of the constitution requires that all taxes levied for State purposes be paid into the State treasury, and section 17 of article 4 provides that no money may be withdrawn from the State treasury except in pursuance of an appropriation made by law, the funds to pay these tax anticipation notes cannot be withdrawn from the treasury except by an appropriation to meet an obligation of the State, and that the appropria-

tion made by this act indicates, therefore, an additional obligation arising on these notes, or if, on the other hand, these notes create no obligation on the State then no such appropriation can be made. The appropriation of the fund to meet the expenses of the University of Illinois was made by the Fifty-sixth General Assembly. Under sections 25 and 26 of the act entitled "An act in relation to State finances," approved June 10, 1919, as amended, (Cahill's Stat. 1929, p. 2467,) funds appropriated may be used for the purpose to which the appropriation is made, to and including June 30 of the year in which the next General Assembly shall convene. The appropriation in this act is, in effect, an extension of the time in which the funds already appropriated may be used. This evidently was done to render such funds available for the purpose to which they were originally appropriated in case the delay in the collection of the tax should extend beyond June 30, 1931. To this no objection is seen. It is not a new appropriation or the appropriation of a new or different fund and does not represent any new or different obligation of the State. It is true, this appropriation is to meet an obligation of the State, but the obligation here is not a new one or different from that provided for by the original appropriation of this fund, and, in fact, is but a re-appropriation to continue available the funds originally appropriated to meet the same obligation. Such is in nowise an appropriation to meet a new obligation, and for the reason stated cannot, as a re-appropriation, be considered objectionable. We cannot agree with the argument that the appropriation in this act is to meet a new or increased obligation, or that it in any way indicates an intention to create, or produces the effect of creating, a debt against the State.

We are of the opinion that these notes do not create any debt or liability against the State, either absolute or contingent, and that the act is not open to the constitutional objections urged. The writ is therefore awarded.

*Writ awarded.*